# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| BETH ANN CURETON, MD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| CENTRAL MAINE MEDICAL CENTER, | ) | |
| CENTRAL MAINE HEALTHCARE, | ) | |
| BRIDGTON HOSPIT.AL, and | ) | |
| RUMFORD HOSPITAL, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Beth Ann Cureton, MD, by and through her undersigned counsel, alleges for her Complaint herein as follows:

## NATURE OF THE ACTION

1. This is an action for employment discrimination based upon religion.  The case arises from the joint employment of Plaintiff by Central Maine Medical Center and X-Ray Professional Association.

## JURISDICTION AND VENUE

2.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this litigation involves questions arising under Title VII of the Civil Rights Act of 1964, as amended ("Title VII").

3.  This Court also has subject matter jurisdiction under 28 U.S.C. § 1332, since the matter in controversy exceeds the value of $75,000 and is between citizens of different states.

1

4. Venue is properly in the District of Maine under 28 U.S.C. § 1391(b)(1) and (2) because all Defendants maintain their principal place of business in the State of Maine, and because a substantial part of the events or omissions giving rise to the claim occurred in the State of Maine.

## PARTIES

5. Plaintiff Beth Ann Cureton, MD is a diagnostic and interventional radiologist. Dr. Cureton resided at 29 Derby Lane, North Yarmouth, Maine from May 28, 2020 until July 26, 2022. She currently resides at 115 Inverness Drive, McMurray, Pennsylvania.

6. Plaintiff is a lifelong Christian, holding sincerely held religious beliefs.

7. Defendant Central Maine Healthcare ("CMH") is an integrated healthcare delivery system serving people living in central, western and mid-coast Maine. Upon information and belief, Defendant CMH has, and had at all times relevant to this case, more than 500 employees.

8. Defendant Central Maine Medical Center ("CMMC") is a Maine hospital located in Lewiston, and a member of the CMH system. Upon information and belief, Defendant CMMC has, and had at all times relevant to this case, more than 500 employees.

9. Defendant Bridgton Hospital ("BH") is a Maine hospital located in Bridgton, and a member of the CMH system. Upon information and belief, Defendant BH has, and had at all times relevant to this case, more than 500 employees.

10. Defendant Rumford Hospital ("RH") is a Maine hospital located in Rumford, and a member of the CMH system. Upon information and belief, Defendant RH has, and had at all times relevant to this case, more than 500 employees.

11. Defendants CMH, CMMC, BH and RH may be referred to hereinafter collectively as "the Hospitals."

## PROCEDURAL HISTORY

12. On January 25, 2022, Plaintiff filed with the U.S. Equal Employment Opportunity Commission ("EEOC") a Charge of Discrimination against CMMC (Cureton v. Central Maine Medical Center, Charge No. 523-2022-00154).   A copy of the Charge of Discrimination is attached hereto as Exhibit A.

13. In response to the Charge of Discrimination, CMMC submitted its Position Statement by letter dated March 2, 2022, a copy of which is attached hereto as Exhibit B.

14. Dr. Cureton responded to CMMC's Position Statement by letter dated August 24, 2022, a copy of which is attached as Exhibit C.

15. On September 7, 2022, the EEOC informed Dr. Cureton by letter, a copy of which is attached as Exhibit D, that it had concluded its inquiry into her allegations of discrimination and determined that it was unable to conclude that the evidence provided by Dr. Cureton established a probable violation of Title VII.

16. Also on September 7, 2021, the EEOC issued a "Determination and Notice of Rights," a copy of which is attached as Exhibit E, dismissing the Charge of Discrimination and advising Dr. Cureton of her right to sue respondent CMMC within 90 days.

## SUBSTANTIVE ALLEGATIONS

17.  Radiology is a medical discipline that uses different modalities of medical imaging to diagnose disease and guide treatment.  "Diagnostic radiology" refers to the reading and interpretation of medical images.  Diagnostic radiology can be, and is routinely, performed remotely from the patient.  "Interventional radiology" involves the use of catheters and specially designed needles to

acquire medical imaging and execute minimally invasive procedures.  Interventional radiology typically occurs in the same location as the patient.

18. Dr. Cureton is fully licensed and qualified to practice, and practices, both diagnostic and interventional radiology.

19. X-Ray Professional Association ("XRPA") is a Maine professional services corporation engaged in the practice of medicine, specifically radiology.

20. On February 11, 2020, Dr. Cureton signed a two-year employment contract with XRPA, pursuant to which she agreed to provide radiology services to XRPA clients.  Dr. Cureton moved to Maine with her husband and three minor children during the last week of May 2021, and commenced working with XRPA on July 5, 2020.

21. XRPA's sole clients are Defendants, representing all of its work volume and revenue. XRPA provides both on-site and remote radiology services to Defendants pursuant to a Medical Imaging Services Agreement (the "XRPA Services Agreement").

22. Dr. Gregory Friedel is the President of XRPA and one of its Directors, and an XRPA partner.  The XRPA Services Agreement designates Dr. Friedel as the XRPA partner serving as "Medical Director of Medical Imaging" for Defendants.  In that capacity, Dr. Friedel was responsible for day-to-day operations and general management of the Radiology Departments at the Hospitals.  He was also required to, "[w]here requested, review and consent to credential files pertaining to applying and renewing physicians and mid-level providers."

23. All XRPA partners attended a monthly Radiology Department management meeting at CMH.  The monthly management meeting included key CMH radiology staff and technology leadership.

24. XRPA and Defendants exert significant joint control over the same employees and share or co-determine those matters governing essential terms and conditions of employment. The XRPA Services Agreement shows that Defendants:

- Are required to provide XRPA and its employed or retained radiologists with the facilities, equipment, supplies and hospital personnel necessary for the operation of the medical imaging services provided to patients by XRPA pursuant to the agreement;
- Require that radiologists employed or retained by XRPA maintain membership in good standing on Defendants' Medical Imaging Department's Medical Staff and maintain all necessary Hospital privileges;
- Require that each radiologist comply with the bylaws, policies and procedures of Defendants' medical staff, as well as the bylaws, policies and procedures of the Hospitals including, without limitation, Radiology Department performance improvement policies and procedures;
- Require that each radiologist comply with Defendants' policies pertaining to relationships with patients, visitors and personnel;
- Require that XRPA provide Defendants with individual quality improvement profiles for each radiologist providing services under the agreement;
- Have the right to decline radiology services from a specific radiologist employed or retained by XRPA in certain circumstances;
- Dictate the hours of XRPA radiologists providing both on-site and remote radiology services under the agreement; and
- Impose (in Schedule C to the Agreement) comprehensive and detailed "performance standards" for XRPA providing remote radiology services under the agreement

25. XRPA partners do not maintain offices separate from Defendants' facilities, and use "@cmhc.org" e-mail addresses.

26. Under their Medical Staff By-laws, Defendants have the authority to investigate and discipline XRPA radiologists that they have credentialed, by *inter alia* modifying or removing clinical privileges, which can have a direct impact on overall employability and income-earning potential.

27. It is clear that Defendants controlled various aspects of the terms, conditions, or privileges of Plaintiff's employment. They were sufficiently involved in, and in fact necessary and

5

integral to, the total employment process such that they must be considered to have acted as Plaintiff's *de facto* joint employers for purposes of jurisdiction under Title VII.

28. On August 12, 2021, the Maine Department of Health and Human Services ("DHHS") issued a temporary emergency rule (the "Emergency Rule") modifying 10-144 CMR Ch. 264 ("Immunization Requirements for Healthcare Workers"), by imposing a COVID-19 vaccine mandate (the "Vaccine Mandate") on each "Employee" of a "Designated Healthcare Facility." The Emergency Rule defined "employee" to mean "any person who performs any service for wages or other remuneration for a Designated Healthcare Facility." It defined "Designated Healthcare Facility" to mean *inter alia* a "multi-level healthcare facility" or "hospital." The Emergency Rule permitted no religious or philosophical "exemption" from the COVID-19 vaccine mandate, but did allow for other types of reasonable accommodation, and did allow for an exemption based on the professional judgment of a qualified healthcare provider that immunization against COVID-19 may be medically inadvisable. Under the Maine Administrative Procedures Act ("MAPA"), the Emergency Rule was valid for no more than 90 days.

29. Under CMMC's Medical Staff By-law No. 5.4B, clinical privileges are granted to individual practitioners by the CMMC Board of Trustees for a term of 2 years. At the expiration of the 2-year term, the practitioner must apply for renewal. Medical Staff By-law No. 5 sets forth detailed procedures for the renewal of clinical privileges. The procedures include review and comment on each individual application for renewal by the relevant department head (in this case, presumably Dr. Friedel for the Radiology Department), review and comment by a Medical Executive Committee that makes a recommendation to the Board of Trustees, and final action by the Board of Trustees.

30. On August 19, 2021, Dr. Cureton applied to Defendants for the renewal of her clinical privileges at the Hospitals. A copy of the completed Radiology Privilege Request Form is attached hereto as Exhibit F.

31. Separately, she emailed Defendants and Dr. Friedel simultaneously, requesting Defendants' form for seeking an exemption from the Vaccine Mandate on religious grounds, and stating: "I want to do everything possible to preserve my employment with XPA and my compliant position as a physician in this hospital."

32. Dr. Cureton repeatedly requested a "reasonable accommodation" of her religious beliefs from Defendants so that, in the event Defendants' denied her exemption request, she could continue to work for the Hospitals and provide radiology services remotely to patients. XRPA already owned all of the equipment it would need to enable Dr. Cureton to work remotely, off-site from the Hospitals, from a workstation set up in her home. Similarly, Defendants already had all of the technology that they needed to permit delivery of remote diagnostic radiology services.

33. Diagnostic radiology - both preliminary image reading and final image reading - is routinely performed remotely. The technology that permits both preliminary and final reading via remote diagnostic radiology has existed for decades and has steadily improved with time. It is universally regarded to satisfy all professional and practice standards and to meet the standard of care nationwide.

34. XRPA was already contractually obliged in August 2021 to provide diagnostic radiology services to Defendants under the XRPA Services Agreement. XRPA had familiarity and confidence in the remote reading technology and process. Over the course of her employment at XRPA, approximately 60% of Plaintiff's work had consisted of diagnostic radiology, and 40% had consisted of interventional radiology. All XRPA partners carried a significant diagnostic radiology caseload.

The volume of diagnostic radiology exceeded the capacity of the XRPA partners to perform it, forcing them to outsource diagnostic radiology to sub-contractors to accomplish all diagnostic reading required between the hours of 8pm and 8am daily.  No other XRPA partners or employees were seeking a similar accommodation of a sincerely held religious belief.

35. Dr. Cureton's XRPA Employment Agreement is silent as to any allocation of Plaintiff's work between the two primary types of radiology, diagnostic and interventional.  It does not state that Dr. Cureton is being hired or employed as an interventional radiologist at all, whether exclusively or partly.  The term "interventional radiology" does not appear anywhere in the Employment Agreement.  The Employment Agreement simply states that Dr. Cureton "shall furnish professional clinical services within the specialty of radiology", and employs her as a radiologist generally.  Similarly, Dr. Cureton's job at XRPA had not been advertised as an interventional radiology position.

36. On September 1, 2021, Maine DHHS published a draft (the "Draft Final Rule") of proposed amendments to 10-144 CMR Ch. 264.  The Draft Final Rule contained the Vaccine Mandate found in the Emergency Rule, but amended the definition of "Employee" so as to exclude anyone who "exclusively works remotely."

37. The language in the Draft Final Rule provided a basis for the reasonable accommodation sought by Plaintiff, since it was entirely feasible for her to "exclusively work[ ] remotely" providing diagnostic radiology services.

38. On September 2, 2021, Dr. Cureton submitted her exemption form to Defendants, for all hospitals in the CMH network.  The exemption form was explicitly based on her sincerely held religious beliefs.  A copy of the form is attached hereto as Exhibit G.

39. Plaintiff did not demand that she be permitted to continue to work on site in the Hospitals, or state that the exemption was the exclusive accommodation that she was seeking.  At the same time that she sought the exemption, and additionally, Plaintiff sought from Defendants a reasonable accommodation that would allow her to retain her clinical privileges and continue in her employment, based on her ability to perform diagnostic radiology services remotely rather than onsite at the Hospitals, communicating these requests to Dr. Friedel in his capacity as Defendants' Medical Director of Medical Imaging, with responsibility for privileging in the Radiology Department.

40. Under the circumstances, it is clear that Defendants were on notice at least as of September 2, 2021, and likely as early as August 19, 2021, that Plaintiff was requesting and required a reasonable accommodation based on her sincerely held religious beliefs.  Defendant had enough information to make it aware that a conflict existed between Plaintiff's religious observance, practice, or belief and the Vaccine Mandate.

41. Moreover, Plaintiff's request for reasonable accommodation was one that Defendants were entirely capable of granting without incurring an undue hardship in the conduct of their business.  As is clear from the face of the Hospital's Radiology Privilege Request Form, diagnostic radiology – both preliminary image reading, and final image reading -- is routinely performed remotely from the patient.  Plaintiff regularly performed diagnostic radiology remotely with equipment no different than that already at the disposal of CMMC and XRPA.   XRPA already owned all of the equipment it would need to enable Plaintiff to work remotely, off-site from the hospital, from a workstation set up in her home.  Similarly, the Hospitals already had all of the technology that they needed to permit delivery of remote diagnostic radiology services.

42. On numerous occasions throughout September and October 2021, Dr. Cureton engaged Dr. Friedel in his dual capacity as Defendants' Medical Director of Medical Imaging as XRPA President, and various other XRPA partners, in conversation regarding a reasonable accommodation of her sincerely held religious beliefs, based on her performing remote diagnostic radiology services.

43. On or about October 20, 2021, Dr. Friedel entered Dr. Cureton's office and commenced an awkward conversation.  He informed Dr. Cureton that accommodating her sincerely held religious belief was "not possible."  He did not say that accommodating her religious belief would work an undue hardship on Defendants or XRPA.  He did not rule out or even question the feasibility of making scheduling accommodations, such as voluntary substitutes and swaps, flexible scheduling and change of job assignment.  He did not identify any additional cost that would be incurred by Defendants or XRPA as a result of the accommodation.  He did not reference any of the "undue hardship" criteria set forth in Section 2, para. 21 or Section 14, para. 2 of the Employment Regulations of the Maine Human Rights Commission.

44. Instead, Dr. Friedel shifted all of the blame onto Defendants, and stated unequivocally that an accommodation was not possible because Defendants had refused to provide "tech support" for a remote position.  In contrast, Defendants' legal counsel, under the penalty of perjury, in responding to Plaintiff's EEOC complaint, has stated that in fact XRPA *never* discussed any accommodation with Defendants: "Neither did XRPA ever suggest to CMHC that it intended to employ or engage the Complainant as an exclusively remote radiologist"; "XRPA [n]ever provided an accommodation request to CMMC indicating that Complainant could satisfactorily perform her job duties exclusively remotely."

45. Further, no additional "tech support" is required for the provision of diagnostic radiology services.  Dr. Cureton regularly performs diagnostic radiology remotely, with equipment no different

than that already at the disposal of Defendants and XRPA.   In their EEOC response, Defendants never assert that accommodating the provision of diagnostic radiological services remotely is infeasible, or that the accommodation would impose an "undue hardship" on any of the hospitals. They simply repeatedly state that XRPA never requested any such accommodation.

46.  In conversation held on or about October 20, 2021, Dr. Friedel informed Dr. Cureton that her employment would end October 29, 2021.

47.  On October 28, the support staff in the radiology department at CMMC threw a going away party for Dr. Cureton.   That same day, Dr. Cureton exchanged the following emails with XRPA:

> April Martin to Dr. Cureton, 11:34AM:
>
> *"Have you sent an email to Medical Staff Office resigning your privileges at CMMC, Bridgton and Rumford?"*
>
> Dr. Cureton to April Martin, 11:49AM:
>
> *"I'm not resigning. I thought I've been abundantly clear that I wish to preserve my employment. I am awaiting further instructions from XPA and CMMC on the status of my credentials and contract."*
>
> Dr. Friedel to Dr. Cureton, 6:00PM:
>
> *"We have confirmed with CMMC that your privileges throughout the CMMC network will be automatically suspended effective October 29, 2021 based on your current status as unvaccinated for COVID-19. According to CMMC's chief medical officer, John Alexander, your automatic suspension will NOT result in an immediate reporting to NPDB. Under the terms of Section 11(a)(ii) of your employment agreement with X-Ray, PA dated as of February 11, 2020, suspension of your CMMC privileges results in an automatic termination of your employment. The effective date of termination of your employment coincides with the effective date of the suspension of your privileges."*

48.  None of the legal rules or documents at play - the Emergency Rule, the Employment Agreement, the XRPA Services Agreement, the CMMC Medical Staff By-laws - compels an automatic suspension or termination of Dr. Cureton's clinical privileges due to her unvaccinated

status. Dr. Cureton's clinical privileges had been granted to her on May 6, 2020, and would not expire until December 31, 2021

49. The CMMC Medical Staff By-laws govern admission to the Medical Staff, and the granting, modification, suspension, termination and resignation of clinical privileges. By-law No. 7 sets forth detailed procedures for any change to clinical privileges, that include *inter alia* progressive steps designed to avoid the imposition of any restrictions on privileges, an investigation process and procedure, notice to the practitioner and an opportunity to participate in the process, review and recommendation by a Medical Executive Committee, automatic suspension in certain limited circumstances, and in all other circumstances precautionary suspension leading to a full hearing. None of the circumstances specifically identified in By-law No. 7.3A as triggering the automatic suspension of clinical privileges exists in this case.

50. On November 8, 2021, CMH emailed Dr. Cureton to inform her "the Board of Trustees has approved your request for medical staff membership and has granted your requested privileges." The email attached three letters, one from CMMC, one from BH and one from RH, renewing Dr. Cureton's privileges. The letters indicate that the renewal action had been taken on November 3, 2021. The email and letters are attached as Exhibit H.

51. Under By-law No. 5.4B, clinical privileges are granted to individual practitioners by the CMMC Board of Trustees for a term of 2 years. At the expiration of the 2-year term, the practitioner must apply for renewal. By-law No. 5 sets forth detailed procedures for the renewal of clinical privileges. The procedures include review and comment on each individual application for renewal by the relevant department head (in this case, presumably Dr. Friedel for the Radiology Department), review and comment by a Medical Executive Committee that makes a recommendation to the Board of Trustees, and final action by the Board of Trustees.

52. On November 10, 2021, Maine DHHS replaced the Emergency Rule and the Draft Final Rule with a final rule (the "Final Rule"). As expected, the Final Rule exempts from the Vaccine Mandate those employees who "exclusively work remotely", and defines the term to mean those who "provide services while outside the physical premises of a Designated Healthcare Facility and have no direct contact (clinical, hands-on, or face-to-face interaction) with patients, visitors, and other employees." This language provides a broad pathway to the reasonable accommodation sought by Dr. Cureton.

53. On January 10, 2022, Defendants wrote to Dr. Cureton to inform her that her "resignation" from their medical staff "was accepted on January 6, 2022, effective October 28, 2021." CMMC's Medical Staff By-law No. 6.3.A states that a doctor holding clinical privileges "may voluntarily reduce his/her Clinical Privileges or resign from the Medical Staff by submitting an electronic or written request to the senior Hospital administrator responsible for the medical affairs or to the Medical Staff President..." Dr. Cureton never resigned her position on Defendants' medical staff, and never resigned her employment at XRPA.

54. As a direct and proximate result of Defendants' discrimination, Dr. Cureton and her family were forced to sell their home in Maine and relocate to Pittsburgh, Pennsylvania, and have suffered pecuniary, psychological and emotional harm.

## CLAIM FOR RELIEF

### COUNT I

**Religious Discrimination in Violation
of Title VII of the Civil Rights Act of 1964
42 U.S.C. § 2000e *et seq.***

55. Plaintiff repeats, re-alleges and incorporates by this reference all of the foregoing and succeeding allegations, as if fully set forth herein.

56. Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., it is an unlawful employment practice to discriminate against an employee on account of her religion.

57. As she clearly communicated to Defendants, Plaintiff believes that her physical body is a temple for the Holy Spirit, and that injecting her body with any of the COVID-19 vaccines would violate her prayerfully requested guidance from God. Her sincere and deeply held religious beliefs preclude her from accepting injection with any COVID-19 vaccine.

58. Defendants were aware of the fact that Dr. Cureton's sincerely held religious beliefs conflicted with the COVID-19 Vaccine Mandate. Nevertheless, they conditioned her further employment on her violation of her sincerely held religious beliefs, and clearly conveyed that her failure to be injected with the COVID-19 vaccine would result in her termination.

59. Defendants, each conspiring with and aiding and abetting the other, and in concert with XRPA, acted with malice or with reckless indifference to Plaintiff's rights, and terminated her position on Defendants' medical staff, her Hospital privileges and her employment on account of her sincerely held religious beliefs, observations or practices in violation of Title VII.

60. As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has been damaged in that she has incurred the loss of wages, salary and benefits, and other economic loss, in an amount greater than $300,000 (the exact amount to be determined at trial).

61. As a further direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered humiliation, emotional, mental and physical distress, loss of enjoyment of life, reputational harm, and other nonpecuniary losses, in an amount according to proof.

62. Because Defendants' discriminatory actions were done maliciously and in reckless and wanton indifference to Plaintiff's civil rights, Plaintiff seeks punitive damages sufficient to punish

Defendants, and to send a clear signal that such intentional and flagrant discrimination will not be tolerated.

63. Attorney's fees are recoverable in an action for which they are specifically provided by statute. 42 U.S.C. §§ 1988 and 2000e-5(k) provide that reasonable attorney's fees and costs are recoverable herein. Plaintiffs are entitled to reasonable attorney's fees and costs.

## COUNT II

### Failure to Provide Religious Accommodation in Violation of Title VII of the Civil Rights Act of 1964
### 42 U.S.C. § 2000e *et seq.*

64. Plaintiff repeats, re-alleges and incorporates by this reference all of the foregoing and succeeding allegations, as if fully set forth herein.

65. Title VII requires employers to provide reasonable accommodation for religious beliefs, observances and practices short of incurring an undue hardship.

66. Plaintiff has a sincerely held religious belief which precludes her from being injected with the COVID-19 Vaccine. Plaintiff provided Defendants with oral and written notice of her belief, and sought reasonable accommodation that would enable her to provide remote diagnostic radiology services.

67. Defendants violated Plaintiff's right to have her request for religious accommodation met with a good faith effort to explore possible religious accommodation, and refused to make any effort at all to provide religious accommodation to Plaintiff, instead conspiring with and aiding and abetting each other, and acting in concert with XRPA, to terminate Plaintiff's employment.

68. As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has been damaged in that she has incurred the loss of wages, salary and benefits, and other economic loss, in an amount greater than $300,000 (the exact amount to be determined at trial).

69. As a further direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered humiliation, emotional, mental and physical distress, loss of enjoyment of life, reputational harm, and other nonpecuniary losses, in an amount according to proof.

70. Because Defendants' discriminatory actions were done maliciously and in reckless and wanton indifference to Plaintiff's civil rights, Plaintiff seeks punitive damages sufficient to punish Defendants, and to send a clear signal that such intentional and flagrant discrimination will not be tolerated.

71. Attorney's fees are recoverable in an action for which they are specifically provided by statute. 42 U.S.C. §§ 1988 and 2000e-5(k) provide that reasonable attorney's fees and costs are recoverable herein. Plaintiffs are entitled to reasonable attorney's fees and costs.

## COUNT III

### Retaliation in Violation
### of Title VII of the Civil Rights Act of 1964
### 42 U.S.C. § 2000e *et seq.*

72. Plaintiff repeats, re-alleges and incorporates by this reference all of the foregoing and succeeding allegations, as if fully set forth herein.

73. Plaintiff was at all times herein an employee covered by 42 U.S.C. § 2000e, *et seq.*, prohibiting discrimination in employment on the basis of religion. Defendant was at all times herein an employer subject to 42 U.S.C. 2000e, *et seq.*

74. Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), it is an unlawful employment practice for an employer to retaliate against an employee who opposes unlawful discriminatory conduct.

75. As alleged herein, Plaintiff opposed unlawful discriminatory conduct by, including without limitation: rejecting Defendants' denial of her request for an exemption, rejecting

Defendants' "resignation" fiction, informing Defendants that their actions violated her civil rights, and reporting for work in spite of Defendants' instructions not to report.

76. Defendants retaliated against Plaintiff for opposing their religious discrimination, by threatening to terminate her employment, by threatening to revoke or suspend her privileges, by demanding the repayment of monies, and finally by actually terminating Plaintiff's employment.

77. As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has been damaged in that she has incurred the loss of wages, salary and benefits, and other economic loss, in an amount greater than $300,000 (the exact amount to be determined at trial).

78. As a further direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered humiliation, emotional, mental and physical distress, loss of enjoyment of life, reputational harm, and other non-pecuniary losses, in an amount according to proof.

79. Because Defendants' discriminatory actions were done maliciously and in reckless and wanton indifference to Plaintiff's civil rights, Plaintiff seeks punitive damages sufficient to punish Defendants, and to send a clear signal that such intentional and flagrant discrimination will not be tolerated.

80. Attorney's fees are recoverable in an action for which they are specifically provided by statute. 42 U.S.C. §§ 1988 and 2000e-5(k) provide that reasonable attorney's fees and costs are recoverable herein. Plaintiffs are entitled to reasonable attorney's fees and costs.

**WHEREFORE**, Plaintiff Beth Ann Cureton, MD, respectfully prays for judgment as follows:

    1. awarding Plaintiff compensatory and punitive damages in the maximum amount permitted by law; and

    2. awarding Plaintiff pre-judgment interest; and

    3. awarding Plaintiff reasonable costs and attorney fees; and

4.      granting Plaintiff such other and further relief as the Court deems just and proper.

Dated this 6th day of December, 2022, at Portland, Maine.

Respectfully submitted,

*/s/ F. Ronald Jenkins*
_____
F. Ronald Jenkins (Maine Bar No. 4667)
Meridian 361 International Law Group, PLLC
97A Exchange Street, Suite 202
Portland, ME 04101
www.meridian361.com
Tel. 202.361.4944
Email Jenkins@meridian361.com